IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2014 DEC -5  PM 2: 39

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____
               DEPUTY

UNITED STATES OF AMERICA

-vs-                                                  CAUSE NO.  A-13-CR-346-SS

MICHAEL BAKER (1)
MICHAEL GLUK (2)

_____

### O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and

specifically Defendant Michael Baker's Motion for a New Trial Under F.R.C.P. 33(b)(1) [#365], the

United States' Opposition [#370] thereto, and Defendant's Reply [#377] thereto, Defendant Michael

Gluk's [Motion for] Joinder of Defendant Michael Baker's Motion for a New Trial [#374],[1] and the

United States' Opposition [#379] thereto.  Having reviewed the documents, the governing law, and

the file as a whole, the Court enters the following opinion and orders.

### Background

This is the second round of motions for new trial[2] filed by Baker and by Gluk pursuant to

Federal Rule of Criminal Procedure 33.  Rule 33 allows a court, upon motion by a defendant, to

"vacate any judgment and grant a new trial if the interest of justice so requires."  FED. R. CRIM. P.

33(a).  Baker and Gluk, then the CEO and CFO of ArthroCare Corporation, were indicted and

---

[1] Gluk's Motion for Joinder [#374] is GRANTED.

[2] Baker first argued he was entitled to a new trial because the Government constructively amended the
Superseding Indictment by introducing certain evidence concerning healthcare fraud. *See* July 2, 2014 Order [#302] at
7. Gluk argued he was entitled to a new trial because of the Court's allegedly improper admission and exclusion of
certain evidence, and because of alleged unfair prejudice in being tried alongside Baker. *Id.* at 8. The Court denied both
motions. *Id.* at 10.

charged in a fifteen-count Superseding Indictment with conspiracy to commit wire and securities fraud, substantive wire and securities fraud, and making false statements to the United States Securities and Exchange Commission (SEC). Baker and Gluk's four-week jury trial was the fifth case in this Court involving ArthroCare, a medical device company founded in Austin, Texas which grew from a small business into a publicly-traded corporation and employed many residents of the Austin area. Preceding Baker and Gluk's case were two national class action suits, one against ArthroCare's Board of Directors and one against the corporation itself; an action against ArthroCare filed by the SEC; and a criminal action against two ArthroCare officers who pleaded guilty one day before their trial was set to begin. Baker and Gluk's indictments followed.

All of the cases involving ArthroCare, including Baker and Gluk's case, were heavily followed by both local and national media. Defendants' trial began on May 5, 2014; on June 2, 2014, the jury returned a unanimous verdict finding both guilty of all counts charged in the Superseding Indictment. Both Baker and Gluk now contend their Sixth Amendment right to a public trial, as articulated by the Supreme Court in *Presley v. Georgia*, 558 U.S. 209 (2010) (per curiam), was violated during their criminal proceedings, entitling them to a reversal of their convictions and a new trial.

According to Defendants, on the morning of May 5, 2014, "members of the public—including the families of Mr. Baker and co-defendant Michael Gluk—who wished to attend the voir dire of prospective jurors . . . were excluded from the courtroom during the entirety of the jury selection process[.]" Def.'s Mot. New Trial [#365] at 1. Specifically, Baker claims a court security officer (CSO) advised his wife and mother that because all available seats in the courtroom were needed for prospective jurors, they could not be seated during jury selection. *Id.* at 2–3. Baker

provides a declaration from his wife, who testifies the CSO stated they "would be unable to be seated at the outset of jury selection because all seats in the courtroom would be needed for prospective jurors. [The CSO] further stated that he would come out and let [us] know if and when seats opened up in the courtroom." *Id.* [#365-1], Ex. 1 (Jan Baker Decl.) at ¶ 5. Ms. Baker further testifies she and the other family members were never "inform[ed] . . . that we were permitted to enter the courtroom," and states neither they "or to my knowledge, any other member of the public[,] witness[ed] any portion of the jury selection." *Id.* at ¶ 7. Gluk joins Baker's description of the May 5, 2014 events, and offers the declaration of his wife, Karin Gluk, who avers she and her two children were present in the courtroom when the CSO instructed them to leave to make room for the prospective jurors. [Mot. for] Joinder [#374-1], Ex. A (Karin Gluk Decl.) at ¶¶ 2–3.

The Government contests Baker's claim no members of the public were present for jury selection and provides affidavits from four lawyers who witnessed jury selection and represented neither Baker, Gluk, nor the State. *See* Gov't Resp. [#370-3], Ex. B (Knight Aff.); *id.* [#370-4], Ex. C (Glaser Aff.); *id.* [#370-6], Ex. D (Hoefling Aff.); *id.* [#370-7] (Ewing Aff.) (averring they were present during the entire voir dire process, were never asked to leave the courtroom, and observed other members of the public present during jury selection). The four lawyers did, however, represent persons who might be called as witnesses. *See* Knight Aff. ¶ 2; Glaser Aff. ¶ 2; Hoefling Aff ¶ 2; Ewing Aff. ¶ 2.

Given the large amount of publicity surrounding this case, sixty-eight (68) people were called to serve as prospective jurors. Sixteen (16) jurors—twelve primary and four alternate jurors, the maximum number of alternates—would ultimately be selected to serve. Although the undersigned's courtroom is the maximum size permitted by the United States General Service Administration

-3-

(GSA) for a District Judge's courtroom, the available seating in the courtroom gallery can normally accommodate only fifty-four (54) persons during proceedings. While this brand-new, multi-million dollar federal courthouse was being designed, the District Judges fought hard for larger courtrooms capable of seating a greater number of people. The Western District of Texas has the busiest weighted docket in the United States and has for a number of years; the undersigned is responsible for a large number of criminal actions and frequently tries high-publicity, multi-defendant cases; yet the undersigned's pleas for more space in the courtroom such that situations precisely like this one could be avoided fell on deaf ears. Consequently, on May 5, 2014, it was necessary to bring in an additional eighteen (18) folding chairs. The additional chairs were placed within the well of the courtroom, along the wall separating the gallery from the well, increasing the number of seats available to seventy-two (72).

Ten persons from Baker's legal team were present in the courtroom for voir dire: Rusty Hardin, counsel; Andy Drumheller, counsel; Tyler Newby, counsel; Jeremy Monthy, counsel; Annasara Purcell, counsel; Jay Pomerantz, counsel; Derek Hollingsworth, counsel; Jennifer Borger, paralegal; Stella James, paralegal; and Jason Bloom, a non-lawyer jury consultant. Seven persons from Gluk's legal team were also present: Chuck Meadows, counsel; Adam Tyler, counsel; Jason Lewis, counsel; David Klaudt, counsel; and Jonathan Leech, Susan Henner, and Kary Johnson, none of whom are more specifically identified in the transcript or on the docket sheet. Given the large number of attorneys, paralegals, and other members of Baker and Gluk's legal teams present in the courtroom at the outset of jury selection, it is the undersigned's recollection that several persons affiliated with Defendants were seated not at counsel's table, but in the jury box itself.

The Clerk brought the jury panel into the courtroom at 9:30 a.m. *See* Gov't's Resp. [#370-2], Ex. A (Trial Tr.) at 30:22. Voir dire began shortly thereafter, and continued until 11:57 a.m., when the Court dismissed the jury panel from the courtroom. A few minutes later, the Court recessed for half an hour while counsel discussed which venirepersons would be stricken. *See id.* at 104:2–19. Counsel exercised their strikes in chambers. *See id.* at 104:8–10, 19. The undersigned then returned to the courtroom at 12:40 p.m. to bring in the panel of venirepersons who had been selected and immediately excused those not selected before breaking for lunch at 12:49 p.m. *Id.* at 108:9–10, 112:12. When court opened at 2:15 p.m. following the lunch break, there were, of course, plenty of seats available in the gallery. The jury was thereafter empanelled and sworn in, at which time the Bakers and Gluks were present in the courtroom. *See* Jan Baker Decl. at ¶ 7 (indicating they were in the courtroom at 2:15 p.m.); Karin Gluk Decl. at ¶ 5 (indicating they were in the courtroom when opening statements were made); Trial Tr. at 112:19 (showing proceedings recommenced following the lunch break at 2:16 p.m.).

## Analysis

A defendant has the right to a trial open to members of the public. *Waller v. Georgia*, 467 U.S. 39, 46 (1984). The public-trial requirement benefits the accused, as a public trial discourages perjury, encourages witnesses to come forward, and ensures the judge and prosecutor carry out their duties responsibly. *Id.* The right extends not only to opening statements and the presentment of evidence, but also to the jury selection phase of trial, including voir dire. *Presley*, 558 U.S. at 212–13. Because denial of the right is a "structural defect affecting the framework within which the trial proceeds," *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991), if shown, it ordinarily "requires automatic reversal[.]" *Washington v. Recuenco*, 548 U.S. 212, 218–19 (2006). "It does not

necessarily follow, however, that every deprivation in a category considered to be 'structural' constitutes a violation of the Constitution or requires reversal of the conviction[.]" *Gibbons v. Savage*, 555 F.3d 112, 120 (2d Cir. 2009), *cert. denied*, 558 U.S. 932 (2009). That is, "not every improper partial closure implicates [Sixth Amendment] concern[s]." *Brown v. Kuhlmann*, 142 F.3d 529, 536 (2d Cir. 1998).

To determine whether a closure offends the Sixth Amendment, courts must "'look to the particular circumstances of the case to see if the defendant will still receive the safeguards of the public trial guarantee.'" *United States v. Cervantes*, 706 F.3d 603, 611 (5th Cir. 2013) (quoting *United States v. Osborne*, 68 F.3d 94, 98 (5th Cir. 1995)). Those safeguards include (1) ensuring a fair trial; (2) reminding the government and the judge 'of their responsibility to the accused and the importance of their functions'; (3) encouraging witnesses to come forward; and (4) discouraging perjury." *United States v. Greene*, 431 F. App'x 191, 195 (3d Cir. June 17, 2011) (quoting *Peterson v. Williams*, 85 F.3d 39, 43 (2d Cir. 1996)). If a closure does not jeopardize those safeguards, it is trivial and lacking in constitutional force. *United States v. Patton*, 502 F. App'x 139, 141–42 (3d Cir. Oct. 23, 2012). Additionally, "courts have placed considerable emphasis on the role of the trial judge in assessing whether a closure is of constitutional magnitude and have resisted ascribing to judges the unauthorized actions of courthouse personnel." *Greene*, 431 F. App'x at 196 (citing *United States v. Al-Smadi*, 15 F.3d 153, 154 (10th Cir. 1994); *Snyder v. Coiner*, 510 F.2d 224, 230 (4th Cir. 1975)).

The Court finds there were no violations of Defendants' Sixth Amendment rights during jury selection on May 5, 2014. While it is true the undersigned's courtroom was filled past capacity that morning given the large number of venirepersons, Defendants' lawyers, and other personnel on

Defendants' legal teams, the courtroom was certainly not closed to the public. On the contrary, as evidenced by the affidavits provided by the Government, at least four persons other than the parties and the parties' lawyers—Jack Knight, Richard Glaser, Matthew Hoefling, and Gary Ewell—were present during jury selection. Defendants argue, without citation to any authority in support, that potential witnesses' attorneys do not qualify as members of the public for a public trial analysis. The Court disagrees, particularly in light of the fact that Knight, Glaser, and Hoefling represented potential witnesses for both the prosecution and the defense, including witnesses Defendants called in their case-in-chief. *See* Gov't's Resp. Joinder [#379] at 2 & n.2 (stating Hoefling represented Clifton Teague, who Baker called in his case-in-chief, Knight represented Corrine Ervin, who Gluk called in his case-in-chief, and Glaser represented three witnesses on Baker and Gluk's witness lists but not the Government's witness lists).

Importantly, the Court and its personnel took every reasonable measure to ensure the maximum number of persons possible were seated in the courtroom on May 5, 2014. Not only were an additional row of chairs added inside the well of the courtroom, but at least one person, *see* Ewing Aff. ¶ 4, and perhaps more than one person, was permitted to sit at the probation table within the well of the courtroom just to the right of the bench. At approximately 9:07 a.m., prior to the start of voir dire, the Court discussed on the record whether there would be sufficient seating for the persons present in the courtroom at that time:

> THE COURT: . . . Counsel, one of the things that I lost heavily with the government when we built this building is the government was of the opinion that no one comes to courtrooms, so we have very limited seating. I only have two, four, six people out there. One of them is masquerading as my marshal. Do you have seating for them, [CSO Hall], on the back row?
>
> COURT SECURITY OFFICER: They're going to go up—probation table.

Trial Tr. at 21:9–18.

The efforts of the Court and its personnel to ensure the maximum amount of seating possible in the courtroom distinguishes this case from *Presley*. In *Presley*, the defendant, on his motion for new trial based upon exclusion of the public from voir dire, "presented evidence showing that 14 prospective jurors could have fit in the jury box and the remaining 28 could have fit entirely on one side of the courtroom, leaving adequate room for the public." *Presley*, 558 U.S. at 210. The trial court denied the defendant's motion, stating "it preferred to seat jurors throughout the entirety of the courtroom[.]" *Id.* Here, nothing further could have been done to create additional seating in the courtroom consistent with fire safety regulations, as the gallery, jury box, and tables within the well of the courtroom were all full of people. Additionally, all four of the District Judge courtrooms in the courthouse are the same size—the maximum size permitted by the GSA—and have the same problem of limited seating, particularly in a celebrated case requiring the selection of sixteen jurors.

To the extent the Baker and Gluk families were temporarily unable to find seating in the courtroom because the room was filled to capacity, no constitutional violation occurred; the Sixth Amendment requires that trials be open to the public, not that seats must be available for every person who wishes to attend. *Patton*, 502 F. App'x at 142 (citing *Gibbons*, 555 F.3d at 116 ("[N]o single member of the public has a right to gain admittance to a courtroom if there is no available seat. That is, so long as the public at-large is admitted to the proceedings, the Sixth Amendment does not guarantee access to unlimited numbers.")). While Defendants are correct that in the usual course, "'an accused is, at the very least, entitled to have his friends, relatives, and counsel present'" at his trial, Def.'s Reply [#377] at 3 (citing *In re Oliver*, 333 U.S. 257, 271–72 (1948)), it is also true, as noted above, that "[n]onetheless, in some circumstances, exclusion of members of the public from

a judicial proceeding does not implicate the constitutional guarantee." *United States v. Rivera*, 682 F.3d 1223, 1229 (9th Cir. 2012) (citing *United States v. Perry*, 479 F.3d 885, 890 (D.C. Cir. 2007)). Here, members of the public were not excluded, the Court and its personnel made efforts both to increase the amount of seating available and to accommodate those persons in the courtroom when voir dire began, and the courtroom was filled to capacity.

Finally, the Court notes no members of either Baker or Gluk's enormous legal teams advised the Court that family members were present and could not be seated. At no time did the Court know there were people, much less family members, present in the hall who could not get a seat in the courtroom. Had anyone brought this to the Court's attention, accommodation for the Bakers and Gluks, up to and including temporary ejection of other persons, would certainly have been considered. The Court had already permitted persons to sit in unconventional locations throughout the courtroom given the lack of available space. Yet Defendants' lawyers failed to object to, raise a constitutional infirmity regarding, or otherwise complain in any way concerning insufficiency of seating in the courtroom during voir dire. Additionally, Defendants waited over four months to bring the matter to the Court's attention. To the extent Defendants knew their families were present and unable to find seating during voir dire and failed to raise an objection, they waived their right to do so. *See United States v. Reagan*, 725 F.3d 471, 488–89 & n.6 (5th Cir. 2013) (citing and quoting *United States v. Hitt*, 473 F.3d 146, 155 (5th Cir. 2006)) ("Where a defendant, with knowledge of the closure of the courtroom, fails to object, that defendant waives his right to a public trial.").

## Conclusion

It is the Court's opinion insufficient seating in the courtroom to accommodate all members of the public who wished to observe proceedings for a single window of approximately two and a

half hours during a trial which lasted for four weeks neither jeopardized Defendants' right to a fair trial nor undermined the other values the public trial guarantee is intended to protect. There was thus no Sixth Amendment violation.

Accordingly,

IT IS ORDERED that Defendant Michael Gluk's [Motion for] Joinder of Defendant Michael Baker's Motion for a New Trial [#374] is GRANTED; and

IT IS FINALLY ORDERED that Defendant Michael Baker's Motion for a New Trial Under F.R.C.P. 33(b)(1) [#365], in which Defendant Michael Gluk joins, is DENIED.

SIGNED this the 4th day of December 2014.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE